IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| ERICA J. SMITH,<br><br>    *Plaintiff*,<br><br>v.<br><br>GEORGIA KIDNEY CONSULTANTS, LLC,<br><br>    *Defendant*. | CIVIL ACTION NO.<br>3:22-cv-00075-TES |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Erica J. Smith filed a Complaint against Defendant Georgia Kidney Consultants, LLC, seeking damages for religious-based employment discrimination, breach of contract, and intentional infliction of emotional distress.[1] [Doc. 1]. After discovery, Defendant filed a Motion for Summary Judgment, [Doc. 14], to which Plaintiff responded. [Doc. 21]. Upon review of the record and applicable law, the Court **GRANTS** Defendant's Motion for the reasons stated below. [Doc. 14].

**FACTUAL BACKGROUND**

Plaintiff Erica J. Smith is a Christian, nurse practitioner, and former employee of Defendant Georgia Kidney Consultants, LLC ("GKC"). [Doc. 16, Smith Depo., pp. 13–

---

[1] Plaintiff also seeks attorney's fees and expenses of litigation. [Doc. 1, pp. 8–9].

14, 134–35]; [Doc. 16-4, ¶ 8]. GKC, a limited liability company located in Watkinsville, Georgia, hired Plaintiff on November 16, 2020. [Doc. 1, ¶ 9]; [Doc. 16, Smith Depo., p. 15:3–5]; [Doc. 17, Mackay Depo., p. 10:2–3]; [Doc. 16-1, Employment Agreement, p. 1]. On January 1, 2021, Plaintiff and GKC executed an Employment Service Agreement ("Employment Agreement") that outlined Plaintiff's terms of employment with GKC. [Doc. 16-1, p. 1]; [Doc. 16, Smith Depo., p. 21]. Specifically, the Employment Agreement provided for termination of Plaintiff's employment "upon the happening of . . . Employee's failure to rectify a breach of any material term which is not specifically enumerated in this Item, within thirty (30) days after written notice thereof from Employer." [Doc. 16-1, p. 6]. The Employment Agreement also provided for termination "upon ninety (90) days prior written notice by either Employee or Employer to the other." [*Id.*].

Dr. Rene Mackay is the founder and co-owner of GKC. [Doc. 14-3, Mackay Aff., ¶¶ 2–3]. When Plaintiff began her employment with GKC, he owned 100% of GKC's membership interests. [*Id.* at ¶ 2]; [Doc. 14-4]; [Doc. 14-5]; [Doc. 14-6]. On January 1, 2021, Dr. Mackay transferred a 10% ownership interest in GKC to Dr. Julio Pena ("Dr. Pena"). [Doc. 14-3, Mackay Aff., ¶ 3]; [Doc. 14-4]; [Doc. 14-5]; [Doc. 14-6].

Like Plaintiff, Dr. Mackay is a Christian. [Doc. 17, Mackay Depo., p. 15]. In fact, Dr. Mackay and his wife prayed that he would find a nurse practitioner to work with him, and his wife believed Plaintiff was the answer to that prayer. [*Id.* at pp. 14–15]. Dr.

Mackay and Plaintiff discussed their common faith while Plaintiff worked at GKC. [*Id.* at p. 15]. And although Plaintiff didn't consider Dr. Pena religious, she believed he respected her Christian faith. [Doc. 16, Smith Depo., pp. 48–49].

The Covid vaccine became available to local hospital staff—such as GKC employees—in January 2021. [*Id.* at p. 45]. Dr. Mackay, Dr. Pena, and Emily Waldron, a nurse practitioner at GKC, asked Plaintiff on separate occasions whether she had signed up to get her vaccine yet. [*Id.*]; [Doc. 16-4, ¶ 5]. Plaintiff "did not believe in her professional/medical opinion that she was at risk from dying from Covid and taking a vaccination that had not been tested for long term effects seemed more risky than possibly getting Covid." [Doc. 16-4, ¶ 5].

Several months later, on August 2, 2021, Ashley Faulk, GKC Manager of Office Operations, texted Plaintiff and asked whether she had received a Covid-19 vaccine yet. [Doc. 16-2]; [Doc. 16-3, p. 1]. She also informed Plaintiff that she would need to get the vaccine or submit exemption forms by September 21, 2021, to enter St. Mary's Hospital and Piedmont Athens Regional Medical Center. [Doc. 16-2, p. 2]. Plaintiff told Faulk that she hadn't gotten the vaccine and would instead "take the exemption form." [*Id.* at pp. 2–3]. Faulk told Plaintiff that St. Mary's had exemption request forms that she could submit for review, and that she would look into Piedmont's exemption request process. [*Id.* at p. 2].

Within a few hours, Faulk emailed Plaintiff with information about St. Mary's'

3

processes for obtaining religious and medical exemptions to the vaccine. [Doc. 16-3]. On August 6, 2021, Plaintiff texted Faulk that she "never saw any of the vaccine stuff for Piedmont," but that she would bring her St. Mary's form the next time she visited the office. [Doc. 16-2, p. 4]. Because Plaintiff was on maternity leave, Faulk texted back that she could scan and email the forms to her. [*Id.*]. She also told Plaintiff that Piedmont had not yet sent out "anything formal" regarding the vaccine-exemption process like St. Mary's did. [*Id.*].

On August 11, 2021, Doctors Mackay and Pena sent a letter to all GKC staff stating that all staff "must be fully vaccinated or complete the vaccination series by Tuesday, Sept. 21." [Doc. 16-5 (emphasis omitted)]. Although the letter said, "refusal of vaccination will result in termination," it also noted that "[i]f you have an exemption, please inquire about the exemption forms, and we can get those to you. You MUST have a Doctors Exemption Letter to be exempt from Georgia Kidney Consultants." [*Id.*].

Sometime between August 12 and 17, 2021, Plaintiff told GKC Practice Manager Hannah Courson that she would speak with her primary care physician about whether she qualified for a medical exemption to the vaccine. [Doc. 16, Smith Depo., pp. 36–39, 63–65]; [Doc. 18, Courson Depo., p. 26]. She also told Courson that she wished to submit a religious exemption, but that it was her understanding that doing so wasn't an option according to the letter Doctors Mackay and Pena sent to GKC staff. [Doc. 16, Smith Depo., pp. 63–64]. On August 17 or 18, 2021, Plaintiff's primary care physician told her

that she didn't qualify for a medical exemption to the vaccine. [*Id.* at pp. 37–38, 55–56].

Courson followed up on August 18, 2021, and Plaintiff told her that while she didn't have any luck with her primary care physician, she and her husband would "pray about it" and that she would let Courson know her decision by the end of that week. [Doc. 16-4, ¶ 14]. Two days later, Plaintiff told Courson that after praying about it with her husband, her decision remained the same. [*Id.*]; [Doc. 16, Smith Depo., pp. 66–69]. However, Plaintiff claims she told Courson that she "would be happy to submit . . . a religious exemption" form given that was her "only option."[2] [Doc. 16, Smith Depo., p. 69:3–5]. Courson responded that she would talk to Dr. Mackay and that Plaintiff had every right to refuse the vaccine and didn't have to explain all the details behind her decision. [*Id.* at p. 69:6–14]; [Doc. 18, Courson Depo., pp. 27–28].

On August 31, 2021, Courson emailed Plaintiff informing her that her employment with GKC would end Monday, September 13, 2021, unless she decided to receive the vaccine. [Doc. 16-6, pp. 1–2]. Plaintiff responded that she "intend[ed] to continue with [her] decision." [*Id.* at p. 1]. GKC terminated Plaintiff's employment and stated that the reason for her termination was insubordination because she refused to follow the policy of GKC. [Doc. 18, Courson Depo., p. 31]. Dr. Mackay testified that he

---

[2] Courson testified on deposition that she doesn't recall Plaintiff ever asking her about obtaining a religious exemption to the vaccine during her employment at GKC. [Doc. 18, Courson Depo., p. 27:12–16]. The Court accepts Plaintiff's testimony as true. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) ("[O]n summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record.").

and Dr. Pena made the ultimate decision to terminate Plaintiff's employment together because Plaintiff "refused to get the vaccine." [Doc. 17, Mackay Depo., p. 23:13–18]. Courson testified that the decision was a "group decision," made in a meeting with "the providers and [herself]," based on a policy that they "had in place." [Doc. 18, Courson Depo., p. 35:10–20].

On October 20, 2021, Plaintiff emailed Courson stating that, under her reading of her Employment Agreement, GKC should have given her a 90-day notice prior to her termination instead of the 30-day notice GKC gave her.[3] [Doc. 16-7, p. 2]. Courson emailed Plaintiff back on October 24, with an attached letter signed by Dr. Mackay. [Doc. 16-7, p. 1]; [Doc. 16-8]. In it, Dr. Mackay said that while the Employment Agreement provided a 90-day prior notice for termination without cause, Plaintiff's termination was for cause because she refused to comply with GKC's vaccine policy. [Doc. 16-8]. Plaintiff emailed back, saying that she planned on submitting a religious exemption, Faulk was in the process of getting that paperwork together for her, and the letter GKC sent to all staff about the vaccination policy made it seem like "[t]here was no option to submit a possible religious exemption for review." [Doc. 16-7, p. 1].

The Court will discuss additional facts as they become relevant in the analysis

---

[3] Additionally, Plaintiff said, "I would technically, according to the agreed upon contract be entitled to pay for the remaining 60 days per the 90 day provision of this contract. In addition to this, since there appears to have been a breach in contract, I believe GKC should strike the noncompete section of my contract." [Doc. 16-7, p. 2].

6

below.

## DISCUSSION

**A.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437 (citations and punctuation omitted). The movant may cite to particular parts of materials in the record, including "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (punctuation omitted); Fed. R. Civ. P. 56(c)(1)(A).[4]

"When the *nonmoving* party has the burden of proof at trial, the moving party is

---

[4] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438.

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (alteration in original) (citations and punctuation omitted). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

    **B.**    <u>**Title VII Claims**</u>

Title VII prohibits employers from discriminating or retaliating against employees based on certain characteristics. 42 U.S.C. § 2000e. For GKC to be liable for discrimination under Title VII, it must be an "employer" as defined by Title VII. But, under the facts of this case, GKC doesn't meet the Title VII definition of an "employer."

Title VII defines an employer as "a person engaged in an industry affecting

commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). "[T]he ultimate touchstone under [the employee-numerosity requirement] is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 212 (1997). Thus, if a defendant has not employed 15 or more individuals each working day for 20 weeks out of either the current year or the preceding year, the defendant is not an "employer," and Title VII doesn't apply.

Further, to count as an employee, a given "individual must have an 'employment relationship' with the employer." *Clark v. St. Joseph's/Candler Health Sys., Inc.*, 2006 WL 2228929, at *4 (S.D. Ga. Aug. 3, 2006) (citing *Walters*, 519 U.S. at 212). An individual who does not have an employer-employee relationship with the employer, such as an independent contractor, does not count toward the numerosity requirement of Title VII. *Walters*, 519 U.S. at 211; *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998); *Barr v. Kelsey/95 Corp.*, 2021 WL 3239511, at *3–4 (S.D. Fla. July 29, 2021). "The plaintiff is responsible for proving that there is the threshold number of employees for application of Title VII." *Bouey v. Orange Cnty. Serv. Unit*, 673 F. App'x 952, 954 (11th Cir. 2016) (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

Because GKC terminated Plaintiff's employment in September 2021, the relevant

years for determining whether GKC meets the numerosity requirement are 2020 and 2021. 42 U.S.C. § 2000e(b). If the Court were to exclude Dr. Mackay from the employee count, GKC's payroll records would demonstrate that it never had more than 15 employees for 20 weeks in either 2020 or 2021. [Doc. 14-8, GKC 2020 Payroll Summary]; [Doc. 14-9, GKC 2021 Payroll Summary]. If the Court were to include Dr. Mackay in GKC's employee count, GKC would have employed 15 or more employees for approximately 26 weeks in 2020, and one week in 2021.[5] [Doc. 14-7, Courson Aff., ¶¶ 6–8]; [Doc. 14-8, GKC 2020 Payroll Summary]; [Doc. 14-9, GKC 2021 Payroll Summary]. As the Court explains below, Plaintiff's Title VII claims necessarily fail because Dr. Mackay doesn't count as one of GKC's employees.

Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In *Clackamas*, the United States Supreme Court addressed whether four physician shareholders who jointly owned a practice and comprised its board of directors also counted as "employees" of the practice under the common law. 538 U.S. at 442. There, the Court set about identifying relevant factors for the lower courts to use to analyze whether the professional corporation was the physicians' "employer" under the common law. *Id.* at 444–50.

---

[5] The 26 weeks in 2020 and one week in 2021 are approximate because the pay periods in Defendant's exhibits appear in two-week increments. That is—the first pay period for 2020 ended on 01/10/2020, the last period for 2020 ended on 12/24/2020, and the first pay period for 2021 ended on 01/08/2021. [Doc. 14-8, pp. 1, 8]; [Doc. 14-9, p. 7].

11

The Court began by reaffirming that "the common-law element of control is the principal guidepost" for any analysis. *Id.* at 447–48. But the factors it held to be relevant, which it drew from an Equal Employment Opportunity Commission compliance manual, focused on the question of "whether a shareholder-director is an employee." *Id.* at 449. Those factors included "[w]hether the organization can hire or fire the individual or set the rules and regulations of the individual's work"; "[w]hether and, if so, to what extent the organization supervises the individual's work," "[w]hether the individual reports to someone higher in the organization"; "[w]hether and, if so, to what extent the individual is able to influence the organization"; "[w]hether the parties intended that the individual be an employee, as expressed in written agreements or contracts"; and "[w]hether the individual shares in the profits, losses, and liabilities of the organization." *Id.* at 449–50 (citation omitted).

In other words, "an employer is the person, or group of persons, who owns and manages the enterprise," who "can hire and fire employees," who "can assign tasks to employees and supervise their performance," and who decides "how the profits and losses of the business are to be distributed." *Clackamas*, 538 U.S. at 450. Although *Clackamas* involved a claim under the ADA, the analysis applies to determining whether Dr. Mackay qualifies as an employee of GKC for purposes of Title VII.

Both parties agree that *Clackamas* applies to this case. As Plaintiff correctly noted, "[t]he [*Clackamas*] court held that the inquiry into whether an individual is an employee

12

should include 'whether and, if so, to what extent the individual is able to influence the organization.'" [Doc. 21, Plaintiff's Response, p. 6 (quoting *Clackamas*, 538 U.S. at 450)]. However, Plaintiff's application of *Clackamas* misses the mark. Under *Clackamas*, no reasonable juror could find that Dr. Mackay was an employee subject to GKC's control. For starters, Dr. Mackay founded GKC and owned 100% of it through the end of 2020.[6] [Doc. 14-7, Courson Aff., ¶ 5]. And, as has been the case since Dr. Mackay founded GKC, no one who works there can fire him, assign tasks to him, or supervise him. [Doc. 14-3, Mackay Aff., ¶¶ 7–9 ("There is no one higher than me in the organization of GKC . . .")].

Until January 1, 2021, Dr. Mackay controlled all decisions concerning GKC's hiring and firing of employees, supervision of employees, and distribution of profits and losses of GKC. [*Id.* at ¶ 9]. After January 1, 2021, Dr. Mackay and Dr. Pena made those decisions together. [*Id.*]. And as Dr. Mackay stated in his affidavit, he "control[s] all aspects of [his] work for GKC including setting [his] own schedule and determining [his] own patient count." [*Id.* at ¶ 8]. He's also "subject to personal liability for malpractice claims." [*Id.*]; *see Clackamas*, 538 U.S. at 451 (stating that the fact that the

---

[6] In 2021, Dr. Mackay owned 90% of GKC, and Dr. Pena owned 10%. [Doc. 14-7, Courson Aff., ¶ 5]. But, as stated earlier, even if the Court were to include Dr. Mackay as an employee for 2021, Defendant could only show that GKC had 15 or more employees in just one week in 2021. [Doc. 14-7, Courson Aff., ¶¶ 6–8]; [Doc. 14-8, GKC 2020 Payroll Summary]; [Doc. 14-9, GKC 2021 Payroll Summary, p. 7]. In other words, 2021 doesn't help Plaintiff because it cannot constitute a year in which GKC was an employer defined by Title VII under any circumstance. [Doc. 14-9, GKC 2021 Payroll Summary, p. 7]. Accordingly, the Court's analysis applies to 2020, the only relevant year remaining.

13

director-shareholder physicians "control the operation of their clinic, . . . share the profits, and . . . are personally liable for malpractice claims" weighs against considering them as employees). Even Plaintiff herself admitted that she doesn't know anyone that has any authority over Dr. Mackay and Dr. Pena. [Doc. 16, Smith Depo., pp. 24–26]. These facts certainly do not check all the boxes for an employee that *Clackamas* lays out. 538 U.S. at 449–50 (citation omitted).

Plaintiff sees things differently. She first attacks Defendant's argument by stating that because Courson was GKC's Vice President of Operations—and therefore, no one at GKC had "direct oversight over human resources matters besides her"—Mackay had "***no*** control" over "significant areas of GKC's operations." [Doc. 21, p. 5 (emphasis in original)]. It's unclear how having a vice president of operations means that virtually everyone at GKC was an employee. To be sure, Courson is the one who swore in her affidavit that Dr. Mackay is the founder of GKC, and that Dr. Mackay owned 100% of GKC until January 1, 2021, after which he owned 90%. [Doc. 14-7, Courson Aff., ¶ 5]. And despite Plaintiff's assertions, Dr. Mackay stated that until January 1, 2021, he had ultimate control over all decisions related to hiring and firing employees, and he shared that decision-making power only with Dr. Pena after January 1, 2021, when Dr. Pena became a shareholder. [Doc. 14-3, Mackay Aff., ¶ 9].

Next, Plaintiff points to other factors that she argues demonstrate Dr. Mackay was an employee during 2020 and 2021. Specifically, Plaintiff points to the fact that

GKC has a personnel manager, Mackay receives a salary, GKC—and not Mackay—owns the equipment used for GKC operations, and Mackay signed an agreement defining his status as an "employee," among other factors. [Doc. 21, pp. 6–7]. Even though Dr. Mackay executed an employment agreement with GKC, he signed the agreement as both "physician" and "employer," and no other individual signed the agreement.[7] [Doc. 17-1].

But, Plaintiff correctly argues that some relevant factors or other considerations may weigh in favor of describing Dr. Mackay as an employee. *See Clackamas*, 538 U.S. at 449 n.8, 451 n.11, 450–52. However, none of those outweigh the factors that indicate he's not an employee. *See id.* at 451 ("the answer to whether a shareholder-director is an employee depends on 'all of the incidents of the relationship . . . with no one factor being decisive'") (citations and quotations omitted).

As *Clackamas* explains,

> the common law's definition of the master-servant relationship does provide helpful guidance. At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant. The general definition of the term "servant" in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master." *See also id.*, § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control").

---

[7] *See Clackamas*, 538 U.S. at 450 ("The mere existence of a document styled 'employment agreement' [should not] lead inexorably to the conclusion that either party is an employee."). Regardless, to the extent Plaintiff seeks to use Dr. Mackay's employment agreement as evidence of him being an employee, and as Defendant correctly points out, the agreement was not effective until January 1, 2021. [Doc. 21, p. 6]; [Doc. 21-3, p. 3]; [Doc. 17-1]; [Doc. 14-1].

*Id.* at 448. Using "the common-law element of control [as] the principal guidepost" for this analysis, the Court concludes that Dr. Mackay is not an employee under Title VII. *Id.*

Because Dr. Mackay was not an employee during the relevant period, GKC did not employ "fifteen or more employees for each working day in each of twenty or more calendar weeks" in 2020. 42 U.S.C. § 2000e(b). Therefore, GKC cannot be properly considered an employer and, consequently, cannot be liable under Title VII. Plaintiff's Title VII claims fail to survive summary judgment.

## C.     **Plaintiff's Remaining Claims**

After eliminating Plaintiff's federal claims, only state-law claims remain. However, the Court is not required to hear them. Indeed, federal courts may exercise supplemental jurisdiction over state-law claims "in any civil action of which the district courts have original jurisdiction." 28 U.S.C. § 1367(a). However, "district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[S]tate courts, not federal courts, should be the final arbiters of state law," and when a federal court "has dismissed all federal claims from a case, there is a very strong argument for dismissal, especially where the federal claims are dismissed prior to trial." *Ingram v. Sch. Bd. of Miami-Dade Cnty.*, 167 F. App'x 107, 108 (11th Cir. 2006) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)). "[D]istrict

courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).

Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims against Defendant in accordance with the considerable discretion afforded the Court by 28 U.S.C. § 1367(c)(3). Consequently, all of Plaintiff's state-law claims (Counts IV, V, VI, and VII) against Defendant are **DISMISSED without prejudice**. [Doc. 1]. The Court reminds Plaintiff that should she wish to pursue these state-law claims, she may do so in the appropriate forum in the State of Georgia.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 14]. The Court **DIRECTS** the Clerk of Court to enter **JUDGMENT** accordingly.

**SO ORDERED**, this 2nd day of August, 2023.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**